We're here on a death penalty case. It is United States v. Fields, number 1370025. You're well aware that each side has 30 minutes. You're also well aware that two members of this panel have already heard the case once on direct appeal, albeit a few years ago. So, you know, no need to recapitulate issues that were raised in the direct appeal. And we will, despite the fact you have 30, or because you have 30 minutes, we'll appreciate your abiding by the time constraints. And when the yellow light comes on, you have two minutes. When the red light comes on, you may stop talking, if you need that long. We'll call first Mr. Ellis. Thank you, and may it please the court. My name is Jeffrey Ellis. I'm here with Peter Esayu. We represent the appellant in this case, Sherman Fields. What I want to focus today on primarily is Mr. Fields' claim that he was incompetent to waive his right to counsel, and specifically focus on the substantive claim as opposed to the procedural claims of ineffective assistance or the district court's level of inquiry. Focus on that. And then also focus on his claim of ineffective assistance for failing to do an adequate penalty phase investigation. And again, primarily focus on the failure to investigate Mr. Fields' mental illness. But what I'd like to do before I begin that discussion is pause for a moment to indicate that this is here in a unique procedural posture, because it's here for argument on a certificate of appealability. And as this court recently said in Escamilla, for a certificate of appealability, a defendant needs only to show debatable merit to his failure in favor of granting the certificate of appealability. The other procedural point I would want to make at the beginning is that Mr. Fields was denied an evidentiary hearing on all of his claims in the district court. And the standard under 2255 is that an evidentiary hearing is required unless the motion and the trial record conclusively shows that no Mr. Fields' many attachments in support of his petition certainly raised colorful claims of merit to which he was entitled to an evidentiary hearing. Mr. Ellis, on the question of the evidentiary hearing, the evidentiary hearing would be primarily to resolve any issues of material facts. So I hope that as you address that particular issue, you'll be maybe more specific than the briefing was as to specifically what are the disputed issues of material fact. Certainly. With that, let me begin with the claim that Mr. Fields was incompetent to waive his right to counsel. And again, I would primarily focus on the substantive claim as opposed to the procedural aspects of that. In his 2255 petition, Mr. Fields presented evidence in the way of sworn declarations that he was incompetent to waive counsel, specifically that he had an irrational belief, a delusional belief that was the product of his mental illness. Specifically, Mr. Fields suffers from bipolar disorder. When he becomes manic, he becomes extremely paranoid and grandiose. And that was the diagnosis submitted by Dr. Woods in this case. But at the punishment phase, there was testimony about the fact that he had received psychiatric and psychological treatment at the Youth Commission, that his mother suffered from mental retardation, and that he had been diagnosed with antisocial adolescent behavior disorder. What specifically more is there than that that you think should have been presented to satisfy the effective counsel standard? Well, that was evidence that was presented, I believe in cross-examination of the defense expert about, on the topic of Mr. Fields' intelligence. The defense expert in penalty testified that Mr. Fields was an intelligent man and therefore, his opinion, adaptable. And in response, the government elicited testimony that Mr. Fields had been diagnosed with antisocial personality disorder. In addition, he has been previously diagnosed with bipolar disorder. What was not presented at the hearing on Mr. Fields' competence, a hearing that took all of one minute, was specifically that Mr. Fields was bipolar, that his symptomology is such that he presents when he's in a manic phase as extremely grandiose and extremely paranoid. Mr. Fields in this case said that he believed that his attorneys, his defense attorneys, were working for the prosecution. He had complained about his attorneys earlier in the case, but on the eve of trial, he learned from one of his defense attorneys that that defense attorney had actually been involved in the prosecution of Mr. Fields when he was a juvenile. And as a result of that, he indicated that he believed his prosecutors were actually agents of the government and working against him. There wasn't any inquiry into that by the district court at the time of trial. In fact, the district court specifically told Mr. Fields, as did his counsel, please don't talk about your delusional beliefs. Please don't talk about why you want new counsel. What happened instead, in part because the judge wanted to complete the hearing on competency by the following Monday, was that a local psychiatrist conducted a 30-minute evaluation, did not look into any of the background information that you've referenced, Judge Smith, did not ask Mr. Fields any questions about why he wanted to relieve his counsel and waive the right to counsel, but instead simply found that he had the cognitive ability to understand what he was doing. And we don't challenge that aspect of Mr. Fields' cognition. We recognize that he is bright, but he's also very mentally ill, and the two are not inconsistent. And unfortunately, in this particular instance, what happened, and what Dr. Woods says, is he believed delusionally that his counsel was an agent for the government. And that is evidence that's never been tested. If you read the district court opinion on this, the district court opinion simply cites to the opinion of Dr. Mark, and then as Judge Smith, you referenced the later opinion of Dr. Price, who specifically in his declaration says that he wasn't asked to assess competence. That wasn't something that defense counsel asked him to do. So when you look at the district court order, the district court order is not treating, for instance, Dr. Woods' statement as true, but then finding that there is insufficient evidence to support this claim, that Mr. Fields was incompetent to waive his right to counsel, but instead simply ignored it and found that there was other evidence that was perhaps contradictions that needs to be resolved at an evidentiary hearing. Was he competent in terms of his rationality to waive counsel, or was he incompetent? Of course, what difference would it have made during the guilt phase? Well, Mr. Fields proceeded without counsel, and in our- Standby counsel, though, right? Right, he did have standby counsel. But the denial of the right to counsel, and I recognize we're dealing with a slightly different topic here, but we're dealing with sort of the wrongful acceptance of a waiver of the right to counsel. But when we analyze the value of counsel in a proceeding, courts uniformly treat that as a structural error. In other words, they don't ask to show prejudice, they simply ask whether the court erred in its decision. Well, I understand that, but this is quite a different situation. His conviction was affirmed on direct appeal. Right, his conviction was affirmed on direct appeal because Mr. Fields acted as his own attorney. And I think it's not difficult to recognize how unable he was to fulfill that on, especially in a capital case, to test the evidence, didn't work in this particular case. And probably the best example of that is the fact that Judge Smith required Mr. Fields to take a dry run with a witness who was the critical witness in the case. This was the witness that Mr. Fields alleged was actually the murderer. Mr. Fields had to examine that witness outside of the presence of the jurors, with the prosecutor present, with the witness on the stand, simply because he was so unable. But the judge was justified in that. Wasn't he, given that Mr. Fields, acting on his own, was engaging in what really amounted to testimony rather than questioning? Well, the judge was certainly able to take some steps. What we argued on that particular claim, the claim regarding the preview of cross-examination, was that the steps should not have included the prosecutor being present and the witness on the stand, or that the jury should have been told that this is not the first time this witness has been cross-examined. But my point was actually more towards Judge Jones' question about the reliability of the outcome of the guilt phase. And it's my position that Mr. Fields, acting on his own, because his mental illness interfered with his ability to conduct the trial on his own, doesn't lead to a reliable result. Now, you bring this forward, however, in the context of his decision to waive counsel. I mean, he certainly is not the first defendant to have thought that his lawyers were in league with the government, and won't be the last. But how did this actually manifest itself during the trial, his mental illness, as you put it? Well, it manifested itself most prominently when he said, I believe that my attorneys are working for the prosecution, and therefore I don't want to proceed with them. And therefore he gives up one of the most cherished rights under the Constitution, the right to counsel. So you're focused on just the original decision to give up counsel, rather than on how that then, during the trial itself, produced problems. There are two components of our claim. Thank you for the question. There are two components to the claim. One component focuses prominently on the waiver of the right to counsel, whether Mr. Field was competent to do so. And we indicate that we presented sufficient evidence to merit a hearing on that, and that the court should remand for a hearing. The second part of the claim has to do with Mr. Field's competence to conduct the trial. And that's the issue that really arises most prominently under Indiana v. Edwards. Now, the district court decided under Indiana v. Edwards that Mr. Fields was competent to conduct the trial, and so applied the standard. Recently, in the government's supplemental material, they cited to this court the Panetti case, which raises some questions about whether Indiana v. Edwards applies retroactively. That's the first time that the state ever made any mention of the possible application of Teague. And so I can certainly discuss why this court shouldn't apply Teague, given the government's failure to raise it until supplemental material, and given the fact that the district court decided this case, applying Indiana v. Edwards. But the court is correct that there are two components to our claim. And Indiana v. Edwards does not reach the first component, which is the waiver of the right to counsel. Is there a reason why this waiver is cognizable and habeas when it wasn't raised on direct review? He did have different lawyers on direct review than he had at trial. Correct. And we have raised it as a claim of ineffective assistance of counsel, based on the failure to investigate. And certainly this court's decision... No, no, I'm talking about waiver, his waiver of counsel at the trial. So you're cloaking that in ineffective assistance in order to litigate it now, because otherwise it would be foreclosed from review, would it not? We don't believe so. We believe that we can raise the claim that he was substantively incompetent to proceed, and albeit we have to support it with new evidence, which we did. We don't believe the existing record when the case was reviewed on direct appeal necessarily supported that. But we've also raised it as a claim of ineffective assistance of counsel for counsel's failure to investigate and present that evidence. And this court in Bouchion v. Collins, a 1990 case from this court, specifically held in a similar situation that counsel could be held ineffective for failing to investigate and present evidence of incompetence. And that was a case, a habeas case coming out of a state court, so a 2254, where specifically the court both found that he was substantively incompetent, in other words reached the direct merits, but also found a claim of ineffective assistance of counsel. Likewise, we have also raised it in the posture of the court's limited inquiry into Mr. Field's incompetence, specifically that the court entertained approximately one minute worth of testimony that really didn't reach the question of rationality. In other words, what Mr. Field's underlying reasons were for waiving counsel, and specifically directed counsel and Mr. Field's to stay away from that area, which under Dusky and Godinez v. Moran are important critical areas of inquiry when a defendant wants to waive counsel. And I agree, Judge King, that these comments are not uncommon in criminal courts. I've been a criminal defense lawyer for nearly 30 years now, and I've certainly heard it many times. But the question is really, what underlies that? Is this simply a complaint that the defendant is not satisfied with either the quality of the representation or the accusations and the possible conviction and punishment that follows, or is this actually a delusional belief? Now, it may be that the government wants to put this in the category of, this is just a regular defendant making a regular complaint about the quality of his counsel that really isn't tied to or the product of his mental illness. That's certainly a conflict that could be resolved at an evidentiary hearing. But Mr. Field's presented specific evidence in the form of a testimony, or excuse me, in the form of a declaration of a psychiatrist saying, I've reviewed a great deal of records, records that, for instance, Dr. Mark and Dr. Price didn't review and that the court didn't have, and I've concluded that he is incompetent to waive because he was irrational, because he really did believe that counsel were conspiring against him as an agent of the prosecutor. And you have to read this also within what Mr. Field is doing roughly during this period of time in the detention facility when he's awaiting trial. Because, and that's also information that wasn't considered by Judge Smith, either at the time of the waiver or later. And what he's doing at that point is writing complaints saying, jailers are conspiring to kill me. They're poisoning my food. They're holding KKK meetings outside of my cell. And these are, again, all delusional beliefs that are the product of his mental illness. Did he utilize counsel at the punishment phase? Is that right? He did. And was it the same counsel that he'd been complaining of? It was. And Mr. Field's- I mean, does the record reflect, I don't mean to cut you off and give you a chance to answer, but I mean, does the record reflect that he cooperated with that counsel at the punishment phase? Well, the record doesn't reflect any outbursts by Mr. Field's. But you have to keep in mind what Mr. Field said at the beginning of the case when he waived his right to counsel, which is, if I'm convicted, I'd rather get the death penalty. And so, again, while that's a question, a right question for an evidentiary hearing, if he believed that counsel were working for the prosecution, why did he re-up with them during the penalty phase? Well, they never left, did they? Well, no. They served as standby counsel during the course of the trial. And when he was convicted, he asked the court to have them serve as counsel. But again, he indicated at the beginning that if he was convicted, he'd want the death penalty. And so the evidence, in our view, is as consistent with this continued irrational, delusional belief that his counsel was working for the prosecution as it could support the other view that, in fact, maybe he didn't believe that to the depth that we're saying. So what, in a couple of sentences, what is the test that the district court should have applied when he said that he wanted to be his own lawyers in determining if everything had been done according to the rules, in your view? What was the test that should have been applied? The test that should have been applied was whether the waiver was the product of an irrational delusion. I suppose that's redundant, irrational delusion. But the product of irrationality as a result of his mental illness. Now, where did that come from? Where does that come from, exactly? Well, I think it finds its origins in Dusky, which is a 1960 case from the United States Supreme Court, which described competency as a two-part inquiry. First of all, as the ability to rationally assist counsel and to have a rational and factual understanding of the proceedings. And then it gets renewed in Godinez v. Moran, which is a 1993 case, again from the United States Supreme Court. And all of those cases are focusing on the choice to waive counsel, or the choice in Godinez, I believe, it was also to plead guilty. And so that's half the test. The other test then looks at the actual conduct of the trial by the mentally ill individual. And that comes from, most recently, Indiana v. Edwards. But this court certainly has adopted that in Bouchion v. Collins as well. In response, the government argues that this case should be controlled by a case called Dunn v. Johnson, a 1998 case. And Dunn is easily distinguishable. Dunn, first of all, is a 2254. It's a case involving the imposition of the death penalty by the state. And it's also a case where this court granted a certificate of appealability and found that the issues were of debatable merit, ultimately denied on the merit, but because of the specific findings that the state court had made. May I make a suggestion that you move on to your next issue since you have four and a half minutes? That's a wonderful suggestion, and I'll take it. So the second issue I want to focus on is Mr. Field's ineffectiveness claim based on the failure to investigate his mental illness. And we've been talking a great deal about exactly what that was. Judge Smith, in his order, dismissing this claim, acknowledges that it's possible that mental illness mitigation presented by Mr. Field, if true, could have made a different result, but then concludes that relief is not granted, in part because, he says, the jury had other evidence of Mr. Field's mental illness. But, of course, that other evidence was evidence that Mr. Field was characterized as antisocial, personality disordered, and a sociopath. None of that evidence reduced his culpability. None of it served to humanize him. None of it served to decrease his dangerousness. In fact, the opposite was true. The defense expert was asked whether there was any treatment for being a sociopath, and the answer was no. And so the government took that and was able to promote this idea that that meant Mr. Field would remain dangerous. In contrast, Dr. Woods has diagnosed Mr. Field as bipolar, something that is treatable, something that can be medicated, something that does humanize him. Now, the district court said that this was the type of evidence that was double-edged, and I would agree, except that I would define the double-edge in a different way than Judge Smith used that term. It's double-edged in the sense that it mitigates. It reduces culpability. It humanizes Mr. Field. It explains the trauma that he went through and the consequences of that trauma on his mental health. But it also serves as a double-edge because it takes evidence that the government was able to claim was aggravating and mitigates that. So a great deal of the penalty-face presentation by the government was Mr. Field's misconduct in institutions as a youth, as a young adult, when he was in prison or the youth detention facility. And the only answer that the defense team was able to give to that bad behavior was that Mr. Field is older now and he gets it. Gets it was actually what one of the experts testified to. Instead, if you look at that evidence through the lens of Mr. Field's long and unfortunate history of untreated mental illness, it takes evidence that was formerly aggravating and moves it to the mitigation category. It helps excuse and explain that type of evidence. And so, once again, this is a claim that deserved an evidentiary hearing. There are many contradictions that were resolved in the district court's order simply by saying, I don't believe the evidence presented by Mr. Field. That is the type of evidence that should have been heard in an evidentiary hearing. So with that, I'll ask the court to grant COA and remand this case for an evidentiary hearing and reserve any time unless the court has questions. Are you also embodying in your argument there the idea that even if counsel was ineffective that it also prejudiced the outcome of the case? Absolutely. I mean, we know that this was a jury that was interested in mitigation and actually found a great deal of mitigation. They checked a number of the special interrogatories saying that they found that mitigation existed. This is also a jury that sent out a question that said, we are unable to unanimously agree in penalty phase. What should we do? And we're ultimately told to deliberate longer. So we know at a minimum that this jury was very close to the line based on the scant mitigation that was presented. If you add this mitigation that was assembled in post-conviction and especially the mental illness, Mr. Field is very far over the line and he has shown that he was prejudiced by the failure to investigate this. All right. Thank you. You have time for rebuttal. Ms. Freel. May it please the court. My name is Jennifer Freel and I represent the United States. I want to begin with the idea of prejudice because I think that is where a lot of habeas counsel's arguments break down. As you know, at this phase, there's to be a reweighing of the aggravated versus the mitigating. When it comes to the penalty phase, let's reweigh all of that. And as explained in the briefing, the United States believes that when all of this new aggravating evidence that was presented at the penalty phase, it just simply can't overcome it. What did the jury hear? What did the jury know? The jury knew that Mr. Fields escaped from jail with the purpose of killing his girlfriend, sensory Coleman, that when he got out of jail, the first thing he wanted was a gun and a car that he went to Hillcrest Hospital and convinced his girlfriend to leave with him. Ms. Coleman was visiting her prematurely born infant and he talked her out of that hospital room and into a car with him. The jury knew that he was angry that that baby was not his, that it was born to another man. The jury knew that he drove Ms. Coleman out to the middle of nowhere and shot her twice in the head and dragged her body up onto a trash heap and left her there. The jury knew that Ms. Coleman left behind three small children. The jury knew that earlier that same night, Fields had taken his other girlfriend, Shalika Scroggins, out into the middle of nowhere and had put a gun, well, had contemplated killing her, but then he changed his mind. The jury knew that several days later, he carjacked Tammy Edwards from Hillcrest Hospital. He grabbed her by the throat and as she got away and looked over her shoulder, she saw him point a gun at her. The jury heard, and they heard this in the penalty phase, they heard the testimony of Fields' ex-wife, April Fields, who described the abuse she suffered from Fields, the rape, the control, and she explained that at one point, Fields thought she was being unfaithful, so he took her out into the middle of nowhere and put a gun to her head and she had to beg for her own life. The jury knew that Fields was a serial killer in the making, that Coleman might have been his first victim, but that he had been convicted previously of attempted murder for a drive-by shooting, and their own mitigation specialist, Jane By, had to admit on cross-examination that Fields told her he believed that women existed for his pleasure and that he enjoyed the thug life. He enjoyed toting around guns. He enjoyed the person he had become. Now, contrary to what Habeas Council believes, there was mitigating evidence presented at trial in the areas that now they have found greater detail about. In fact, Jane By, the mitigation specialist, reviewed the new evidence and said, yes, this goes into greater detail than what I discovered, but the jury knew that Fields had a horrific life. The jury knew he'd been abused. The jury knew that his mother lived in very impoverished conditions, that she had her first child at 13. She had Sherman Fields, the defendant, when she was only 15 years old. Sherman never knew his mother. He was significantly older than his teenage mother. When Fields was only two years old, his mother moved in with a man named William Bradford. The jury heard that Bradford beat Sherman's mother, that he beat Mr. Fields and his brothers from the age of two to the age of 11. I mean, talk about formative years. The jury knew that. The jury heard the mitigation specialist explain that. The jury heard his mother, Alice Sweeney, testify. The jury knew that the only way they got out of that bad situation with Bradford was that Fields' mother, Alice Sweeney, shot him, shot him and her best friend, who was also having an affair with him, ended 50 days in jail and got five years' probation. But unfortunately, the jury also heard that it didn't get any better for Fields. Bradford was out of the picture, but they were so poor they had to move to the Estella Maxey Projects in Waco. And once they were in the projects, he was exposed to drugs, and by 12 years old, he was carrying a gun and started getting in trouble at juvenile facilities. The jury heard this traumatic story about how Fields tried to hang himself, and he had his best friend who was in juvie with him, and they both tried to hang themselves, except his best friend succeeded and died. And that Fields was traumatized that his best friend had died. They'd done this suicide pact, and he didn't die, but his best friend did. And there's just a few years later, Fields watches as his grandfather gets mowed over by a drunk driver right in front of him. He had friends who were killed. The jury knew about this, but that didn't overcome the horrible, aggravating things he had done. And the new evidence doesn't either. In some ways, it's difficult because Habeas Council, the conviction was in 2004, and they've been able to put together all this mitigation evidence, and you think, well, why couldn't the original council do that? But when you look at it through the lens of, of course, the council was also preparing for the guilt-innocent phase, and you look at the Supreme Court cases that have reviewed mitigating evidence and what is expected, the courts have consistently held that it's ineffective when council misses a whole area, when council didn't find out about sexual abuse, when council failed to review a file of past convictions, even though they knew the prosecutor was going to talk about that file. That simply isn't what happened here. Council covered all the bases back in 2004. Now, Habeas Council might have gotten things that explain it in greater detail, but that simply isn't enough for, for what they are requesting. The jury knew that Fields had a horrible life, but they also knew he committed a heinous crime. And I think another important thing to point out is that council was stuck with the facts they had. Defense Council at the time had a record of Fields being incarcerated where he behaved terribly. So on issues like future dangerous and how will this guy do with a life in prison, Defense Council was faced with these facts, that Fields threatened guards, he threatened fellow inmates, he made a list of guards he wanted to shoot. He told guards that he had people on the outside who would kill them. He told guards he would kill their families. There was a guard who testified who said he dealt with 20,000 inmates and Fields was in the top 2% in terms of dangerousness. There was testimony about the McLennan Jail on Highway 6, is what they called it, the Highway 6 Jail, which houses federal inmates who are currently in the process of the district court in Waco. And in the history of that jail, there was only one time when they said, we can't house this federal inmate. Send him to a federal facility. And that one time was Sherman Fields. It took 12 guards to get Sherman Fields to the showers. Fields had a horrible habit of masturbating in front of female guards. As I was flipping through the evidence, I thought, oh, this must be a duplicate. These are all on March 24th. But no, he masturbated in front of a female guard three different times on one day. That is what Defense Council had. And in the face of that, they said, you know what, what does this guy have? What good can we show? And they showed that he had an above average intelligence. They got Dr. Price to go in and say, as he ages, some of these problems will go away. They put on guards who had known him over the past year in the federal facility and said, he's gotten better. He's finally with the program. They had the family members say, you know, he was a hard worker. He had a lot of problems, but he helped his siblings with their homework. He had a lot of problems, but he'd get up early in the morning and take care of the horses. And I think it's unfair for us 10 years later to judge them and say, oh, but he should have said that his mother abused him. They should have said that the grandfather abused him. They did the best with what they had. And even if they had done everything that counsel now suggests, it would not have gotten over that hump of all of that aggravating evidence. Can you address his incompetence to waive counsel? Yes, Your Honor. And I want to answer your question, Judge King, about the test because with all due respect, I think it was not adequately addressed previously. The test for competency to stand trial is whether a defendant can rationally discuss his case with his lawyer and whether he has a rational . . . let me make sure I get this perfectly right. Ability to consult with counsel and rational understanding of what's going on. Yes, the facts and the procedure. And there's no sign that he didn't. Yes, he was grandiose. Didn't his attorney . . . well, just what the record shows, his attorneys had no reason to believe that he had a problem, right? That is correct, Your Honor. Don't they have affidavits in the record that say that? That is correct, Your Honor. All right, but my question . . . I mean, I don't want to . . . please answer Judge King's question, but I also want to know what's the standard by which we assess this because looking back at the previous Fifth Circuit opinion, the issue raised on direct appeal was whether his waiver of counsel was voluntary because he had counsel with a conflict. And there's a footnote in that discussion that says something to the effect, he does not say. Otherwise, Fields' waiver of counsel appears to have been knowing and intelligent. In any event, Fields makes no argument to the contrary. I saw that footnote myself when I re-read the case yesterday. And in the district court filings, I personally didn't file the original response. We did not raise the procedural bar on that question. I certainly think it would have been a good approach to take. But knowing that the previous panel did look at the waiver, and granted they were focused more on the conflict with counsel, they certainly reviewed the hearing. You can tell reading that portion of the opinion. And didn't seem to have an issue with the fact that Mark, Dr. Mark, conducted the examination and informed the court after his examination that Fields was in fact competent enough to waive counsel. And I do want to clarify something that I think has been a little distorted. The hearing involving Fields' waiver of counsel occurred on two separate days. I think some of the briefings suggest it was a one-minute hearing. Well, the record shows that the Friday before trial was supposed to start, Fields again asked to represent himself. And the district court judge conducted a full Ferretta hearing on the record. He talked about, you don't know the federal rules of evidence. You don't know the federal rules of criminal procedure. And it was a full hearing. And during this hearing, really toward the end, it's when the prosecutor stands up and says, Judge, an appellate court might look at this and say, maybe we should also examine competency. The only red flag for anyone in that courtroom was that counsel had filed a proposed mitigation instruction saying that Fields suffered from abuse. They said, oh, no, that had more to do with his abuse and neglect. It didn't have to do with his competency as far as understanding. So that was the only red flag. In fact, his counsel said, let's do the competency evaluation, but I will be shocked if anything happens. They find anything. But the district court and Habeas counsel complains that I use this phrase, it bent over backward, but it really did. You get the sense that everyone in that courtroom was talking about Fields. And they found out that Dr. Price was on call and he couldn't evaluate Fields until Monday morning. The district court did not even make a ruling on the motion to proceed pro se Friday afternoon. So then the hearing resumes. Well, before the hearing, Monday morning, Dr. Mark conducted, and it's in the record, his standard interview for competency and current mental status. He did not say, I conducted a truncated brief quick as I could. He said his standard interview, and there's no sign that he's incompetent. And while that might have only taken a few minutes Monday morning, the district court with Dr. Mark's conclusions combined with what happened Friday, full fare at a hearing, came to the conclusion that he was competent to make that decision. And reading the, and I recently reread the full trial. And yes, Fields made some big mistakes. He represented himself and he would have had the benefit of a lawyer. But when you read that transcript, he had a rational and a factual understanding of what was going on. And in fact, because he represented himself, he did not have to testify and take the stand and face cross examination. But several times he told the jury, I didn't do it. Now, prosecutor would stand up and say, oh, let's strike that from the record. But the jury heard him. And certainly in an opening and closing, he presented himself as an innocent man in his own words. And I'm not saying that he did better than counsel would have done. But if we look at the full record, and certainly the district court who was there in 2004 was in a great position to do this. Fields was confident. His performance showed it. His performance showed it. And Judge King, I agree with you just in my own district court practice. It's not uncommon for defendants to think that their attorneys are working with the government. It often happens because of plea negotiations. And I'm very concerned that if what happened with Fields case in a man with an above average IQ, if that is deemed to be, to fall under the standard, then I think there would be other instances where a defendant's right to represent himself would really be curtailed. And I don't think their claim hinges on his IQ. It hinges on what they perceive to be his mental illness, bipolar, and post-traumatic stress disorder. So I don't think it's simply an IQ problem. Apparently not an IQ problem at all. I agree. And the way they're saying it presented itself was the fact that he thought his attorney was working for the government. And they do bring up this idea of, he made some claims about perhaps his guards were members of the KKK and perhaps the guards were poisoning him, but the record shows that that occurred at least six months prior to when he asked to represent himself per se. And also, Fields was not a shy man about saying what he thought was unfair. And during his time at trial, and during this Verretta hearing, he didn't bring up his guards poisoning him. He didn't bring up the KKK. And he didn't bring up his confinement. I think some of these confinement issues are a case of hindsight and, oh, well, you know what? Hey, can't we also point out that they took all these extra security measures and maybe that affected him? Let me just ask you directly, is he bipolar? There was a finding that he was bipolar by the Texas Youth Commission. Way back when? Way back when. So that was in the record at the time. That came out during the mitigation phase. I have been in front of a district court judge who says that half the defendants he sees are bipolar. But that's not one of the mitigating factors that the jury was asked to assess. They didn't. Because the mental health issues at mitigation were, a lot of them came in during cross-examination. In part because what counsel at the time knew was that Texas Youth Commission had a case that was brought forward and said he could not be treated. That he showed no guilt or remorse. And at trial, at least two witnesses who talked about Fields confessing to shooting Coleman and dragging her into the junk pile said that he showed no remorse or guilt. So what counsel at the time had was, okay we've got an antisocial behavior disorder and we've got witnesses confirming it and they had their own interactions with him. And having talked to the prosecutors who were there, there was a lot of evidence that he was a sociopath. So rather than get a complete psych evaluation of him back in 2004, they decided to focus on the positive and his IQ. There was no sign of brain damage. Dr. Price certainly examined him. And back to the waiver, I meant to mention this. Dr. Price in his affidavit says there was no sign that he lacked competency to waive counsel. And Dr. Price evaluated him the day before he made the oral motion to proceed pro se. And of course Dr. Wood did it six years later at the request of Habeas Council. But I will agree and I think the district court acknowledges that the mental health issues are some that were not completely fleshed out. But looking at the affidavits, it's clear why to me, reading the trial. Because you had the sociopath diagnosis, you had his witnesses saying he lacked remorse or guilt. At the same time, the mitigation specialist, Jane By, is telling counsel, I think we should do a complete psych workup. So are you saying, to be a little more pointed about this, they raised this in the context, well aside from competency, ineffective counsel in investigating and producing the evidence of mental illness. And are you saying that counsel were not ineffective because they knew of mental illness and made a conscious, strategic decision not to present it or emphasize it to the jury? Or are you saying that there's no prejudice? I think the first part of your argument was directed to prejudice. Are you also now saying there's no ineffectiveness? Yes, Your Honor, I'm saying both. Would help to just summarize things. Yes, Your Honor, thank you for doing that. So I kept jumping back and forth between the penalty phase and the waiver of counsel, but the issues do touch on each other. And I think reading Dr. Wood's evaluation six years later, and maybe even the average guy on the street might say, this defendant is a death penalty case, he shouldn't have waived his right, he should have had an attorney. But lawyers who work under Ferretta and lawyers in court, the court, know that while it might seem ridiculous to the guy on the street, there is a constitutional right to represent yourself at trial. And I'm glad I wasn't the district court who was faced with that, and certainly the district court did everything in its power to get Fields to change his mind. But Fields had that right, and the record shows that he was competent to make that waiver. I did want to touch briefly on some of the Brady claims that were raised. In reviewing all the briefing, for a moment I thought that some of the Brady issues were ones where there could be some more factual disputes, but in rereading the district court's opinion, it did strike me that with regard to Brady, the district court assumed that the evidence presented by Habeas Counsel was true. That sort of gets us out of that, oh, there's a big factual dispute. In conducting its analysis of the Brady issues, the district court evaluated them as if true, and was left with a conclusion. And if I may summarize the Brady issues, a witness received, there's a letter in evidence that the government gave a key witness, Lee Outley, use immunity for his testimony. But in an affidavit gathered by Habeas Counsel, Outley describes transactional immunity, that he would be immune from any conduct. And the district court looked at that and said, that's just simply not enough to get over the prejudice prong for a Brady challenge, that the difference between, even if the jury completely got the difference between use immunity and transactional immunity, it wasn't going to get over all the evidence of guilt. The other was another witness, DeLeon, who in an interview several years later, suggested that he had sent some notes to the prosecutor. And those notes were never turned over to defense counsel. The notes, according to Habeas Counsel, could have been used for impeachment, because according to this interview, the notes described facts a little differently than DeLeon had discussed at trial. Now, the government would say these notes don't exist. But we don't have to have an evidentiary hearing on that, because the court just assumed that these notes existed, and assumed that, hey, even if there were some impeachment evidence in these notes, DeLeon was one of seven witnesses who testified about Fields confessing to murdering Coleman. And the inconsistencies can easily be explained. For example, one of the inconsistencies was that Fields escaped, carjacked a woman, and then killed Coleman, whereas the record shows that the carjacking took place after. These aren't the types of impeachment evidence that's going to change a jury's decision. So I did want to point that out, because I didn't quite realize in my briefing how the district court had really prevented this issue as far as evidentiary hearing by just assuming that these notes existed, and just assuming that there was some sort of violation with regard to use of immunity versus transactional immunity. So I did want to point that out to the court. If there are no further questions, I do want to just close by stating that this is a sad case. It's a case that has been difficult for me to wrestle with, and it's sad because, I mean, you read the testimony of Coleman's sister, and she describes a two-year-old walking around asking for Mama. How do you explain to a two-year-old that Mama's gone forever? And then you have the horrific testimony about Fields, who has a teenage mother, who moves in with this man who beats him, who is finally out of the abusive situation, only to go into the projects. He had a horrible life, but he allowed it to affect him in such a way that he made other people's lives horrible. And like it or not, in our democracy we have the federal death penalty. And like it or not, a jury of Fields' peers heard the mitigating evidence, heard the aggravating evidence, and suggested that Fields be put to death. And the district court accepted that recommendation. Thank you. Thank you. Okay, Mr. Ellis. Well, the prosecutor's closing comments certainly are quite moving. But of course what they leave out is the severe mental illness that Mr. Fields, and frankly his entire family, has suffered. And what that mental illness does is not only mitigate the crime, but help explain the history. And that mental illness was not investigated. The mitigation investigator in this case, in her sworn declaration, says we did not investigate Mr. Fields' history of mental illness or the family history of it. And so what the jury that sentenced Mr. Fields to death got was essentially the agreed testimony of Dr. Coons, whose methodology has now been rejected by the Texas Court of Criminal Appeals, and Dr. Price, who both essentially agreed that Mr. Fields' conduct was not the product of a severe mental illness, not the product of bipolar, which was hardly discussed at all, if at all. But instead that he was antisocial personality disordered and a sociopath who chose to do these things, who was making conscious free will decisions unimpacted by his mental illness. And so that is an entirely different category of evidence that the jury that sentenced him to death did not hear. In it . . . Well, I'm just wondering, just for the sake of argument, there were 19 things submitted to the jury as mitigating factors, and 12 of them were either found by 11 or 12 jurors. And one of those 12 might have been 9, but the others were all 11 or 12 jurors. Bipolar is not there, I grant you that. But they went on and found that the aggravating outweighed the mitigating, so at the best, it seems to me, this would have been one more mitigating factor. How can it go beyond that? Well, it would have been one more mitigating factor, but it would have also been a mitigating factor that would have helped explain the great deal of aggravating evidence that the prosecutor went through just now. So it would have taken information that was in only the aggravation category and moved it to mitigation. But it simply does, I think, demonstrate the point that this was a very close case. And so if you add this particular piece of evidence, or any of the other evidence that the government says is more of the same, it moves the jury very much towards life. And I want to recognize that this court just recently, in Escamilla, in granting a certificate of appealability, said the test is not simply is there some new category of evidence, but more of the same counts. And in Escamilla, the court cited to Williams, Rompilla, Wiggins, and most recently Sears v. Upton as all cases where some mitigation investigation was done, but it wasn't sufficient. With regard to Mr. Field's competency to waive counsel, the focus of the district court hearing was solely on Mr. Field's cognitive abilities. So for instance, when Mr. Swanton, one of the defense attorneys, says, I think he's competent, he's saying, I think he's smart. And we don't disagree with that. But what Mr. Swanton also said in his sworn declaration was that Mr. Field's believed that he could make witnesses tell the truth, that he had some special power to do that, and that that wouldn't happen if he had counsel. And that's the kind of delusional belief that should be tested in an evidentiary hearing. Likewise, Dr. Mark, in his sworn declaration, said he had no background information, specifically no history of Mr. Field's prior mental health diagnosis. One of the questions that should be answered in an evidentiary hearing is, if presented with that new evidence, the evidence that was uncovered not by trial counsel, but by post-conviction counsel, does that change his opinion? And the same question should be asked of Dr. Price. And that is a reason that this court should grant COA and should remand this case for an evidentiary hearing. Thank you. OK. Thank you very much.